UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| PAUL CIANCIO and TOULA OUSOULJOGLOU, Individually, and as Parents and Next Friends of A.C. and R.C., their Minor Children,  )<br><br>Plaintiffs,  )<br><br>V.  )<br><br>WASHINGTON MONTESSORI ASSOCIATION, INC., d/b/a WASHINGTON MONTESSORI SCHOOL, PATRICIA WERNER, Head of School, SHEILA COAD-BERNARD, and KATHY COE,  )<br><br>Defendants.  ) | Civil No.<br><br><br><br><br><br>February 25, 2015 |

## **COMPLAINT**

### I.   INTRODUCTION

1.     This action is brought by the Plaintiffs to enforce Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181-89, as amended, and its implementing regulation, 28 C.F.R. Part 36, against Defendant Washington Montessori Association, Inc., d/b/a/ Washington Montessori School located in New Preston, Connecticut ("Defendant School," "the School" or "WMS"). This action is also brought to redress claims of breach of contract, negligence, negligent infliction of emotional distress, and failure to properly train and supervise, against Defendant School and Patricia Werner, Sheila Coad-Bernard, and Kathy Coe, individually, and as officers, agents, and employees of the School.  Defendant School and Werner, Coad-Bernard, and Coe are referred to in this Complaint collectively as "Defendants."

2. Defendant School has violated the ADA by: 1) failing to make reasonable modifications to its policies, practices, or procedures for a child, A.C., a twelve year old, who has a mental health disability and who was perceived by Defendants as having such a disability; 2) dismissing A.C. from the School because of his known and perceived disability; and 3) excluding or otherwise denying equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to A.C.'s parents and his older brother, R.C., because of the known and perceived disability of A.C.

3. Defendant School additionally breached the terms of the enrollment agreement pertaining to A.C.; and failed to properly supervise and train its officers, agents and employees in the proper care due A.C. while a student at the School, and in the proper protocol to avoid discriminating against A.C. on the basis of disability. Defendants Werner, Coad-Bernard, and Coe, individually and as officers, agents and employees of the School further acted negligently and with reckless disregard of the immediate medical needs of A.C. on December 10, 2014.

4. To redress these violations, Plaintiffs seek declaratory and injunctive relief, compensatory damages, and attorney's fees and costs against the Defendants, and such further relief as this Court deems just and proper.

## II.  JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action under 42 U.S.C. § 12188(a) and 28 U.S.C. §§ 1331 and 1345. The Court additionally has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. §1367(a).

6. This Court has personal jurisdiction over the Defendants. Defendant School is a Connecticut domestic corporation operating an independent, private, co-

educational Montessori day school in New Preston, Connecticut.  Defendants Werner, Coad-Bernard, and Coe are officers, agents and employees of Defendant School in New Preston, Connecticut, and are residents of the State of Connecticut.

7. Venue is proper in the District of Connecticut pursuant to 28 U.S.C. § 1391(b)(1) because Defendants are located in this district.  Venue is further proper in the District of Connecticut pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims herein occurred in this district.

### III. PARTIES

8. Plaintiff A.C. is a twelve year old boy who resides in the State of Connecticut, with his parents and next friends, Plaintiffs Paul Ciancio and Toula Ousouljoglou, and Plaintiff R.C., his older brother, also a minor.

9. Defendant School is a Connecticut domestic corporation with its principal place of business at 240 Litchfield Turnpike, Preston, Connecticut 06777.  Defendant School is an independent, private, co-educational Montessori day school, serving children from pre-K through 8th grade.  According to its website, the School has an enrollment of 250 children.  *See* www.washingtonmontessori.org/about/quick-facts.

10. Defendant School is a "public accommodation" within the meaning of 42 U.S.C. § 12181(7).

11. Defendant Patricia Werner is a resident of the State of Connecticut and a principal of Washington Montessori Association, Inc.  At all times relevant to this action, Werner was Head of School at WMS.

12. Defendant Sheila Coad-Bernard is a resident of the State of Connecticut.  At all times relevant to this action, Coad-Bernard was Director of WMS Middle School.

3

13. Defendant Kathy Coe is a resident of the State of Connecticut. At all times relevant to this action, Coe was employed as a Head Teacher/Advisor in Humanities at WMS Middle School and was A.C.'s advisor at the Middle School.

## IV. FACTS

14. A.C. is a 12-year-old boy who suffers from depressive disorder, obsessive-compulsive disorder, and severe anxiety. He was diagnosed with these conditions at or around age 8. At all times relevant to this action, A.C. has experienced substantial limitations in major life activities including his ability to learn, as a result of these conditions. A.C. is an individual with a disability within the meaning of 42 U.S.C. § 12102.

15. A.C. was enrolled annually as a student at WMS beginning in September 2010, until his wrongful dismissal in December 2014. His older brother, R.C., attended WMS from in or about September 2008 until his forced withdrawal in December 2014.

16. On or about February 4, 2014, A.C.'s parents entered into a contract with Defendant School to enroll A.C. in Defendant School's middle school beginning in September 2014 (hereinafter, the "Enrollment Agreement"). Under the Enrollment Agreement, A.C.'s parents agreed to and did pay to Defendant School $25,321.20, which included base tuition of $23,800.00, plus certain activity fees and tuition insurance. The tuition and fees were to cover the entire 2014-2015 school year, beginning September 2, 2014 and ending on or about June 10, 2015. A.C.'s older brother R.C. was enrolled in WMS Middle School for 2014-2015 under an identical agreement.

17. At the time of entering into the Enrollment Agreement and at all times relevant to this action, Defendant School was aware of A.C.'s disability.

18. The Enrollment Agreement provides that the Defendant School can dismiss a student at any time or decline to re-enroll a student for "a) discipline and/or academic reasons per its own determination or b) should it determine that the actions of the Parents undermine its ability to accomplish its mission." For the School's "mission," the Enrollment Agreement refers to its "Statement of Purpose" on its website at http://www.washingtonmontessori.org/about/statement-of-purpose.

19. Defendant School's Statement of Purpose states that the School "has a special focus on developing each child's unique capabilities. This is accomplished through a commitment to the development of self-esteem, responsibility, and independence based on Montessori philosophy, common sense, and current educational research." It further provides that "[o]ur objective . . . is for students to become confident, autonomous adults with a personal philosophy that includes sensitivity and respect for other people and the environment, a sense of justice, a belief in the peaceful resolution of differences, and a clear recognition of their own role in society."

20. Defendant School's website also boasts under "faqs" (Frequently Asked Questions) that it "provides a personalized learning experience for each student" and "nearly every student can thrive in a WMS classroom—the highly capable child, the dyslexic child, the shy child, the active child—because our classroom program and materials are specially designed to accommodate a variety of learning styles." http://www.washingtonmontessori.org/enrollment/faqs.

21. In preparation for the 2014-2015 school year, and with the knowledge of Defendant School, A.C. underwent a psychoeducational evaluation to help assess A.C.'s emotional struggles and learning disabilities. The evaluation revealed A.C.'s disability

5

and clinically significant learning difficulties related to that disability. The evaluation recommended certain interventions to help A.C. achieve his highest individual potential of academic success.

22.     Prior to the start of school on September 2, 2014, A.C.'s parents had consulted with Defendants Werner, Coad-Bernard, and Coe, about how best to manage A.C.'s individual educational needs. To help A.C. achieve his personal academic best at WMS during 2014-2015, A.C.'s parents agreed to provide and pay for extra support in the form of one-on-one tutors in math, reading and speech for A.C.

23.     Prior to the start of school, the Defendants and A.C.'s parents also had created a plan for the Defendants to manage the symptoms of A.C.'s mental health disability as needed during the school day ("treatment plan"). The plan followed during the prior school year at WMS (2013-2014) was that when A.C. or his teacher(s) recognized that A.C. was experiencing anxiety symptoms that interfered with his ability to learn (e.g., attention, processing, etc.), he would leave his classroom and go directly the School nurse, who could administer prescription medication that would relieve A.C.'s symptoms and allow him to return to the classroom.

24.     On September 1, 2014, A.C.'s parents were advised that instead of going directly to the School nurse as he did in prior years, A.C. should come directly to Coad-Bernard's office to talk to her first and she would decide whether he then needed to go to the School nurse. A.C.'s parents were assured by Coad-Bernard's representations that she would have immediate access to A.C.'s medication.

25.     Fully aware of A.C.'s disability and having agreed to the treatment plan for such disability, Defendant School accepted A.C. for enrollment in its middle school

program, with a contractual period running from September 2, 2014, through on or about June 10, 2015.

26. A.C.'s first day of Middle School was September 2, 2014. At all times relevant to this action, A.C. was thriving both academically and socially at WMS. That Fall, A.C.'s parents received positive reports from advisors and teachers at WMS about A.C.'s progress in math, reading and other academic activities, as well as afterschool programs including cross country.

27. On or about November 10, 2014, Defendant Coad-Bernard advised A.C.'s parents that she would be absent from the Middle School the next week, for personal reasons. Defendant Coad-Bernard advised A.C.'s parents that A.C. had been leaving classes periodically when he would become anxious and "this is not a big issue, just a check in so we make the best of the next few weeks." Defendants Coad-Bernard and Coe agreed to advise A.C.'s mother about how A.C. was doing generally and whether he was leaving classes due to anxiety, and A.C.'s mother agreed to provide to them A.C.'s self-assessment of his day. The purpose of this exchange of information was to help A.C.'s parents keep track of how often A.C. was leaving class to monitor his anxiety level in case additional intervention was necessary to maximize his participation in class.

28. On December 9, 2014, A.C. reported to his parents that he had good days December 8th and 9th; that he had not left any of his classrooms due to anxiety. That evening, A.C.'s mother advised Defendants Coe and Coad-Bernard of this report via email. In her email, A.C.'s mother also advised that A.C. went to bed feeling anxious after sharing with her some of his frustrations related to learning disabilities. At 10 a.m.

7

on December 10, 2014, Coad-Bernard reported via email to A.C.'s parents that she did not see A.C. on Monday or Tuesday and took that as a good sign.

29.     On December 10, 2014, shortly before noon, A.C. experienced a severe anxiety attack during school.  He left his classroom and walked down to Coad-Bernard's office to talk with her.  After a few minutes, A.C.'s advisor Coe came into the office for a previously scheduled meeting.  Knowing that A.C. was emotionally upset and aware that he suffered from depressive disorder and anxiety, Coe and Coad-Bernard asked A.C. to wait in Coe's empty classroom for them to finish their discussion.  A.C. did as instructed and waited in Coe's empty classroom, alone.  While in the empty room alone for approximately fifteen minutes, A.C. stood on a chair and draped a cord from the window blind around his neck.  He was still standing on the chair when a classmate discovered him, helped him down, and notified Coe and Coad-Bernard immediately.

30.     Coe and Coad-Bernard discussed the chair incident with A.C. (who by now was even more emotionally distressed and crying) but did not take him to the School nurse for his medication.  Coe then went to look for Head of School Werner, but could not find her so stopped in to talk to the nurse instead.  Upon information and belief, Coe did not ask the nurse to examine A.C. or provide A.C. with his medication.  Coad-Bernard then called A.C.'s mother to come pick him up.

31.     Shortly before 1 p.m. on December 10, 2014, A.C.'s mother received a voicemail message from Defendant Coad-Bernard stating that A.C. was very upset and she needed to come get him from school.

32.     Around 1 p.m. on December 10, 2014, after listening to the above voicemail, A.C.'s mother called Coad-Bernard, who repeated that A.C. was very upset

8

and she needed to come get him from the School. Coad-Bernard did not provide details but when asked, told A.C.'s mother that A.C. was safe. When A.C.'s mother asked if he had been to the nurse to obtain his medication, Coad-Bernard stated no. His mother then stated that A.C. needs his medication and Coad-Bernard agreed. His mother then proceeded to go get him from school.

33. After speaking to A.C.'s mother, and after eating lunch with A.C., Coad-Bernard finally asked A.C. if he needed his medication and he said yes. She then walked him down to the nurse who provided his medication. A.C. was then taken back to Coad-Bernard's office to wait for his mother.

34. A.C.'s mother arrived at the School at around 1:20 p.m. and was told by Coe that she needed to remove A.C. from the school immediately; that she could not stop to see the School nurse; and that the School would need a note from A.C.'s doctor before A.C. could return to School.

35. After A.C. left school on December 10, 2014, Defendant Werner was advised of the incident by Defendants Coe and Coad-Bernard.

36. As instructed by Defendant Werner, A.C.'s parents called Werner at home on the evening of December 10, 2014, to discuss what happened with A.C. that day. At that time, Defendant Werner advised A.C.'s parents that WMS is not the "right place for him." A.C.'s parents were upset and asked Werner if she would please reconsider her decision after talking to A.C.'s doctor. Werner agreed that, out of fairness to A.C., she would speak to A.C.'s doctor.

37. A.C's doctor, a licensed psychiatrist with extensive experience assessing children and adolescents with mental health conditions, examined him on December 11,

9

2014, and cleared him to return to school. Thereafter, A.C's father spoke with Werner, told her the doctor had cleared A.C. to return to school, that he was not a threat to himself or anyone else and if the School still had concerns, the parents would hire and pay for a full-time one-on-one aide for A.C. to return to school.

38. On or about December 15, 2014, A.C.'s doctor spoke briefly with Werner and advised her he did not believe A.C. was a threat to himself and he would intensify treatment and observation over school break, but that he could return to school. Werner told A.C.'s doctor she was busy and would talk to the doctor later about his findings in more detail, but she never spoke to him again.

39. In an email dated December 17, 2014, Werner advised A.C.'s parents that A.C. could not return to school, even with the one-on-one aide offered by his parents. In the email, Werner stated she was "not comfortable with taking on the responsibility for [A.C.'s] well being and that of the other students, even with an aide in place. As you have said, [A.C.]'s brain works differently and at this time I think he needs a different educational plan to guide him through to a positive future."

40. Plaintiff A.C. was devastated, angry and humiliated as a result of the School's decision to terminate his enrollment at WMS. He was suddenly separated and cut off from his friends and a network of supportive adults in his life; he was further cut off from afterschool sports at WMS which was an important part of managing his level of anxiety.

41. Plaintiffs, A.C.'s parents, and his brother were equally shocked, outraged and devastated by this decision. A.C.'s parents were forced to also withdraw A.C.'s older brother, R.C., from WMS because in order to get R.C. to school in the morning,

A.C.'s mother would have to drive R.C. to school with A.C. in the car.  The severe sadness and devastation that A.C. would have to endure in reliving the School's discriminatory decision each and every day at such a sensitive time in his adolescent life and in light of his mental health disability was too much to bear for A.C., his parents and his older brother.

42. As a result of Defendants' actions, A.C. and his parents and older brother R.C. have suffered and continue to suffer severe emotional trauma, humiliation and stigma.  As a further result of Defendants' actions, A.C.'s parents were forced into the stressful situation of expending time and resources to figure out alternative educational arrangements and related activities for their adolescent sons.  Ultimately, their parents have been forced to homeschool their sons, A.C. and R.C., denying A.C's mother the opportunity to take on paid employment, and denying A.C.'s dad the opportunity to take on additional paid tutoring he had been engaging in prior to December 10, 2014, in order to supplement the family's income.  In addition, the School has failed to refund all tuition due and owing to A.C.'s parents on account of the dismissal and forced withdrawal of their sons A.C. and R.C. from WMS.

43. Because of their association with A.C., A.C.'s parents and older brother R.C. were denied the full and equal opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of the School.

44. Because of their association with A.C., A.C.'s parents and old brother were denied the ability to contract for, purchase, and utilize needed educational services offered and marketed by the School to parents and readily available to parents of other children without disabilities that manifested as did A.C.'s.

45. The School's discrimination caused A.C., and A.C.'s parents and older brother to feel stigmatized and mistreated, in addition to causing them anxiety, inconvenience, loss of educational opportunity, severe emotional pain, and anguish.

## V. CAUSES OF ACTION

### COUNT I – AGAINST DEFENDANT WMS
### TITLE III OF THE AMERICANS WITH DISABILITIES ACT

46. The allegations of Paragraphs 1 through 45 are hereby re-alleged and incorporated by reference as if fully stated herein.

47. The Defendant School discriminated on the basis of A.C.'s disability in the full and equal enjoyment of its goods, services, facilities, privileges, advantages, or accommodations in violation of Title III of the ADA, 42 U.S.C. § 12182(a) and the Title III implementing regulation at 28 C.F.R. Part 36, by:

    a. failing to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, in violation of 42 U.S.C. § 12182(b)(2)(A)(ii) and its implementing regulation at 28 C.F.R. § 36.302;

    b. disenrolling A.C. on the basis of disability and perceived disability, from the School, which constitutes a denial of the opportunity of A.C. to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity in violation of 42 U.S.C. § 12182(b)(1)(A)(i) and 28 C.F.R. § 36.202;

    c. excluding or otherwise denying equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to A.C.'s parents

and A.C.'s older brother, R.C., because of the known disability and perceived disability of A.C., in violation of 42 U.S.C. § 12182(b)(1)(E) and 28 C.F.R. § 36.205.

48. Defendant School's actions were willful and intentional.

49. As a direct and proximate result of Defendant School's discriminatory actions, Plaintiffs have suffered and continue to suffer losses and damages including severe emotional distress, anguish and humiliation, loss of educational opportunities and loss of income.

## COUNT II – AGAINST DEFENDANT WMS
## BREACH OF CONTRACT

50. The allegations of Paragraphs 1 through 49 are hereby re-alleged and incorporated by reference as if fully stated herein.

51. The Defendant School and Plaintiffs Paul Ciancio and Toula Ousouljoglou entered into a written Enrollment Agreement dated February 2, 2014, for the enrollment of their son, A.C., in WMS's middle school. The period of the contractual agreement was to run from September 2, 2014 through on or about June 10, 2015.

52. Under the Enrollment Agreement, A.C.'s parents agreed to and did pay to Defendant School $25,321.20, which included base tuition of $23,800.00, plus certain activity fees and tuition insurance. Per the agreement, in exchange for the payment of tuition and other fees, the School did promise to provide personalized educational services as stated in the Enrollment Agreement and as advertised on their website, to their son, A.C., from September 2, 2014 until on or about June 10, 2015.

53. At the time of entering into the Enrollment Agreement and at all times relevant to this action, Defendant School was aware of A.C.'s disability.

54. The Enrollment Agreement provides that the Defendant School can dismiss a student at any time or decline to re-enroll a student for "a) discipline and/or academic reasons per its own determination or b) should it determine that the actions of the Parents undermine its ability to accomplish its mission." For its mission, the School references its website at http://www.washingtonmontessori.org/about/statement-of-purpose.

55. On or about December 17, 2014, Defendant School, by and through its officer, agent and employee Defendant Werner, wrongfully dismissed A.C. from the School based on his disability, in violation of the ADA and relevant state laws, and also in breach of the terms and conditions of the Enrollment Agreement.

56. As a result of the School's breach of A.C.'s contract, Plaintiffs Ciancio and Ousouljoglou, were forced to withdrawal their older son, R.C., from WMS in December 2014. R.C. was enrolled in WMS under an identical Enrollment Agreement.

57. As a direct and proximate result of the School's breach of A.C.'s contract, Plaintiffs have suffered and continue to suffer damages including but not limited to unreimbursed tuition and special fees pertaining to A.C. and R.C. paid to WMS for educational services they have not received, additional fees they have been forced to expend in order to educate their sons A.C. and R.C. at home, loss of educational opportunities, emotional distress, anguish, and humiliation, and loss of paid employment opportunities as a result of having to educate their children at home.

### COUNT III – AGAINST DEFENDANTS COE AND COAD-BERNARD
### NEGLIGENCE

58. The allegations of Paragraphs 1 through 57 are hereby re-alleged and incorporated by reference as if fully stated herein.

59. Defendants Coe and Coad-Bernard owed A.C., a minor child in their care with a known mental health disability, a duty to protect A.C.'s health and well-being while at School.

60. Defendants were negligent and breached their duty of care to A.C. in one or more of the following ways:

    a. by disregarding the medical needs of A.C. on December 10, 2014, when he presented to them with symptoms of severe anxiety;

    b. by failing to provide A.C. with his prescription medication or have him evaluated by the School nurse when he first presented to Coad-Bernard's office on December 10, 2014, with symptoms of anxiety, or within a reasonable time thereafter;

    c. by disregarding A.C.'s symptoms of anxiety on December 10, 2014, and without giving him his medication or sending him to the School nurse for evaluation, instead sending him to an empty classroom alone for fifteen minutes, where he proceeded to get up on a chair and drape a cord from a nearby blind around his neck; and

    d. by failing to give A.C. his prescription medication within a reasonable time after he was discovered standing on a chair with the cord to the blinds draped around his neck and instead allowing A.C. to suffer additional severe emotional distress; and

    e. by failing to timely follow the agreed upon plan to manage the symptoms of A.C.'s disability.

61.     As a direct and proximate result of Defendants' acts or omissions, Plaintiff A.C. suffered and continues to suffer severe emotional distress, anguish, humiliation, embarrassment, and loss of educational opportunities.

### COUNT IV – AGAINST DEFENDANTS COE AND COAD-BERNARD
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

62.     The allegations of Paragraphs 1 through 61 are hereby re-alleged and incorporated by reference as if fully stated herein.

63.     Defendants Coe and Coad-Bernard owed A.C., a minor child in their care with a known mental health disability, a duty to protect A.C.'s health and well-being while at the School.

64.     Defendants were negligent and breached their duty of care in one or more of the following ways:

    a.     by disregarding the medical needs of A.C. on December 10, 2014, when he presented to them with symptoms of severe anxiety;

    b.     by failing to provide A.C. with his prescription medication or send him to the nurse for evaluation when he first presented to Coad-Bernard's office on December 10, 2014, with symptoms of anxiety, or within a reasonable time thereafter;

    c.     by disregarding A.C.'s symptoms of anxiety on December 10, 2014, and without giving him his medication or sending him to the nurse for his medication, instead sending him to an empty classroom alone for fifteen minutes, where he proceeded to get up on a chair and drape a cord from a nearby blind around his neck, actions that might have resulted in bodily injury

        d.      by failing to give A.C. his prescription medication or having him evaluated by the School nurse within a reasonable time after he was discovered standing on a chair with the cord to the blinds draped around his neck;

65.      Defendants knew or should have known that their above acts and omissions involved an unreasonable risk of causing A.C. severe emotional distress and that that distress, if caused, might have resulted in illness or bodily harm to A.C.

66.      As a direct and proximate result of Defendants' acts or omissions, Plaintiff A.C. suffered and continues to suffer severe emotional distress, anguish, humiliation, embarrassment and loss of educational opportunities.

## COUNT V – AGAINST WMS AND WERNER
## NEGLIGENCE

67.      The allegations of Paragraphs 1 through 66 are hereby re-alleged and incorporated by reference as if fully stated herein.

68.      Defendants WMS and Werner, as a principal of WMS and Head of School, owed A.C., a minor child in their care with a known mental health disability, a duty to protect A.C.'s health and well-being while at the School.

69.      At all times relevant to this action, Defendants Coe and Coad-Bernard were agents and employees of WMS and acted under the supervision and direct control of WMS and Head of School Werner.

70.      Defendants WMS and Werner are liable for the negligent acts of their agents and employees, including Coe and Coad-Bernard, as alleged in the foregoing paragraphs 1 through 66.

71.      Defendants WMS and Werner were additionally negligent in one or more of the following ways:

17

      a.      by failing to properly train and supervise their agents and employees in the proper care and supervision of A.C., a minor student with a disability in their care;

      b.      by failing to properly train and supervise their employees and agents in recognizing the symptoms of A.C.'s disability;

      c.      by failing to properly train and supervise their employees and agents in the proper implementation of the agreed upon plan for responding to the symptoms A.C.'s disability, including evaluation by the School nurse and/or provision of his prescription medication within a reasonable time;

      d.      by failing to properly train and supervise their employees in determining when a child in their care, such as A.C., needs to be evaluated by the School nurse;

      e.      by failing to implement and follow the proper standards and procedures for evaluating accommodation requests pertaining to students with disabilities (including A.C.), including an individualized assessment, in violation of 28 C.F.R. §§ 36.204, 36.208 & 36.302; and

      f.      by failing to properly train and supervise its agents and employees on the application of the proper standards and procedures applicable to the accommodation of students with disabilities, including A.C.

72.      As a direct and proximate result of Defendants' acts or omissions, Plaintiffs A.C., his brother, R.C., and their parents, Paul Ciancio and Toula Ousouljoglou suffered and continue to suffer severe emotional distress, anguish, humiliation, embarrassment, loss of educational opportunities and loss of income.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court:

    A.    Grant judgment in favor of the Plaintiffs and declare that Defendant School violated Title III of the ADA, 42 U.S.C. §§ 12181-89, and its implementing regulation, 28 C.F.R. Part 36.

    B.    Enjoin Defendant School, its officers, agents, employees, and all others in concert or participation with it, from engaging in discrimination against individuals with disabilities, and specifically from failing to comply with Title III of the ADA, 42 U.S.C. §§ 12181-89, and its implementing regulation, 28 C.F.R. Part 36;

    C.    Order Defendant School to comply with the requirements of Title III of the ADA, 42 U.S.C. §§ 12181-89, and its implementing regulation, 28 C.F.R. Part 36;

    D.    Order Defendant School to take such affirmative steps as may be necessary to restore, as nearly as practicable, each identifiable victim of Defendant School's discriminatory conduct to the position that he or she would have been in but for Defendant School's conduct;

    E.    Award compensatory damages, including damages for pain, suffering, emotional distress, loss of educational opportunities and loss of income to A.C. and A.C.'s parents, and A.C.'s older brother R.C, who are persons aggrieved due to the Defendants' acts or omissions, in violation of the ADA, and in violation of state laws governing breach of contract, negligence and negligent infliction of emotional distress, in an amount not less than $2,000,000.

  F. Award attorney's fees and costs as well as pre-judgment and post-judgment interest.

  G. Order such other relief as the Court finds appropriate and just.

**JURY TRIAL DEMANDED**

        Respectfully submitted,

        FOR THE PLAINTIFFS:

        <u>/s/ Lisa E. Perkins</u>
        Lisa E. Perkins (ct23164)
        Law Offices of Lisa Perkins LLC
        543 Prospect Avenue
        Hartford, Connecticut 06105
        Tel:  860-578-8825
        Fax:  860-236-2234
        Email: lperkinslaw@gmail.com